UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | CHAPTER 11 |
| INGRAM BROTHERS, LLC | ) | |
| | ) | CASE NO. 11-10018 |
| Debtor | ) | |
| | ) | |

## INTERIM ORDER (A) APPROVING POST-PETITION FACTORING AGREEMENT AND FUEL LINE AGREEMENT, (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT, AND (C) MODIFYING AUTOMATIC STAY, PURSUANT TO SECTIONS 362 AND 364 OF THE BANKRUPTCY CODE

**\*\* \*\* \*\***

THIS MATTER, having come regularly before the undersigned upon the motion of **Ingram Brothers, LLC** (the "Debtor") for approval of post-petition factoring of the Debtor by **Transportation Alliance Bank Inc.** ("Secured Party") and the granting of security interests under Section 364 of the Bankruptcy Code (the "Motion"), and it appearing that the immediate entry of this Order is essential to the continued orderly operation of the Debtor's business and is in the best interest of the Debtor and the Debtor's estate, the following findings of fact are made by the Court:

## I. FINDINGS OF FACT

1. On January 6, 2011 (the "Petition Date") the Debtor filed its voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code.

2. The Debtor and Secured Party are parties to a certain (i) **Accounts Receivable Purchase and Security Agreement** dated June 26, 2008 (the "Pre-Petition Agreement"), a copy of which is annexed hereto as Exhibit A, pursuant to which the Debtor sold its accounts to Secured Party,

and (ii) **TAB Fuel Line Agreement** dated September 18, 2008 (the "Fuel Line Agreement), a copy of which is annexed hereto as Exhibit B, pursuant to which the Secured Party makes advances to Debtor to enable Debtor to purchase fuel and other products.

3. The Pre-Petition Agreement provides for advances by Secured Party to the Debtor, so long as such advances do not cause the ratio of the Debtor's obligations to Secured Party to the value (as determined in the Pre-Petition Agreement) of the Debtor's eligible (as determined in the Pre-Petition Agreement) accounts to exceed that set forth in the Pre-Petition Agreement (the "Formula").

4. The Debtor has requested that the Secured Party provide short-term financing to enable the Debtor to purchase fuel and related services and working capital pursuant to the terms of the Fuel Line Agreement.  The Debtor's obligations under the Fuel Line Agreement will be secured by the Collateral (as defined below).

5. As of the Petition Date, the Debtor was indebted to the Secured Party in the amount of at least $1,127,097.70, of which  $596,485.50 is owed under the Pre-Petition Agreement and $530,612.23 is owed under the Debtor's guaranty of the obligations of Day After Day Service's obligations to Secured Party (the "Pre-Petition Obligation") secured by the collateral described in the Pre-Petition Agreement.

6. The Debtor has offered to assign its accounts to Secured Party under the Pre-Petition Agreement and Secured Party has agreed to consider purchasing accounts from the Debtor pursuant thereto.

7. The Secured Party has agreed to continue to provide working capital to the Debtor in accordance with the Pre-Petition Agreement.

BN 7908087v8

8. The Debtor, notwithstanding its efforts to do so, is unable to obtain unsecured credit allowable under 11 U.S.C. Section 503(b)(1) as an administrative expense, or other than pursuant to 11 U.S.C. Section 364(c)(2) and (3), and the Debtor is unable to obtain credit on terms equal to or more favorable than those proposed by Secured Party.

9. Secured Party has agreed to consider providing working capital to the Debtor in accordance with the Pre-Petition Agreement in good faith, within the meaning of 11 U.S.C. Section 364(e), and all interested parties were either notified of the Motion, as evidenced by the affidavit of service, or were present at this Court's hearing on the Motion.

10. Good cause exists for approval of the Debtor's agreement to the financing by Secured Party under the terms of the Pre-Petition Agreement, and the entry of this Order will minimize disruption of the Debtor as a "going concern" and is in the best interest of the Debtor, its creditors, and its estate. The terms upon which the Debtor is authorized to utilize cash advances are determined as fair under the circumstances.

11. The Debtor has provided written notice of the filing of the Motion to Secured Party, the United States Trustee, any Official Creditors' Committee appointed in this Case and its counsel, the twenty largest unsecured creditors of the Debtor, all of the Debtor's secured creditors, the Internal Revenue Service, and all parties who filed requests for notice as evidenced by the affidavit of service filed by the Debtor's counsel with this Court, which notice this Court finds to be appropriate and adequate under Federal Rules of Bankruptcy Procedure 2002 and 4001, and as required by Section 364 of the Bankruptcy Code.

12. The Debtor admits, without prejudice to the rights of an Official Committee of Unsecured Creditors and third parties to challenge same to the extent set forth below, that as of the Petition Date, in accordance with the Pre-Petition Agreement, the Debtor was indebted to the

BN 7908087v8

Secured Party, without defense, counterclaim, recoupment or setoff, in the aggregate amount of at least the Pre-Petition Obligation secured by a valid, enforceable and properly perfected first priority lien in the collateral described therein.

13. The Pre-Petition Agreement with Secured Party provides a vital source of working capital for the Debtor, is in the best interests of the Debtor and its estate, and is necessary to avoid immediate and irreparable harm.

**II. ORDER**

Based on the foregoing Findings, it is now therefore ORDERED as follows:

1. All capitalized terms used in this Order, not otherwise defined herein and unless otherwise indicated, shall have the meaning given them in the Pre-Petition Agreement.

2. The Debtor is authorized, effective immediately, to sell and assign its accounts to the Secured Party pursuant to Bankruptcy Code Section 363, pursuant to the terms of the Pre-Petition Agreement, and to execute all documents and take all actions to be executed and taken in connection with and in furtherance of all undertakings and obligations thereunder.

3. The Debtor is authorized to ratify, and is deemed to have so ratified, the Pre-Petition Agreement.

4. The Debtor is authorized and empowered to (i) assume the Pre-Petition Agreement, (ii) enter into the Fuel Line Agreement, and (iii) incur secured indebtedness to Secured Party pursuant to this Order, the Pre-Petition Agreement and the Fuel Line Agreement in such amounts as needed in the ordinary course of its business and not for any purpose prohibited by law. Debtor's use of the proceeds of such indebtedness shall not affect the rights of Secured Party hereunder.

BN 7908087v8

5. Secured Party and Debtor may amend, modify, supplement, waive the provisions of and/or extend the term of the agreements contemplated herein without further order of the Court provided that same does not materially alter the provisions thereof.

6. Pursuant to Section 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Debtor may grant to Secured Party a security interest in the collateral as set forth in the Pre-Petition Agreement effective as of the date of the filing of the Bankruptcy Case ("Collateral") as collateral for all present and future obligations of the Debtor to Secured Party, including obligations arising under the Pre-Petition Agreement and the Fuel Line Agreement, and including Secured Party's reasonable attorneys' fees and expenses incurred in connection with the negotiation documentation, closing and enforcement of the Pre-Petition Agreement and the protection of Secured Party's rights in this Bankruptcy Case (the "Obligations"). The Secured Party's security interest shall be senior to the claim of any entity now or hereafter claiming an interest in the Collateral. The Secured Party may but need not file an Initial Financing Statement under the Uniform Commercial Code to perfect its security interest in the Collateral.

7. In addition to the fees, costs, charges and expenses authorized under the Pre-Petition Agreement, the Debtor shall pay to the Secured Party within ten business days of demand and without application to the Court (but subject to review by the Official Committee of Unsecured Creditors or the U.S. Trustee,) Secured Party's reasonable attorneys fees and other professional fees arising from or related to the transactions contemplated herein, including without limitation the negotiating, closing, documenting, and obtaining Court approval thereof, the enforcement of Secured Party's rights against Debtor.

8. The Obligations shall constitute a superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code, which shall be deemed allowed, without any further

BN 7908087v8

filing by Secured Party, and which shall have priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code with the exception of Debtor's professional fees and the United States Trustee fees.

9. To the extent that the Debtor may become indebted to any governmental entity, whether for payroll or other taxes or otherwise, and said governmental entity is also an account debtor of the Debtor, the governmental entity's right of setoff, defense , counterclaim or recoupment, if any, shall be subordinate to the rights of Secured Party with respect to accounts owing to the Debtor which comprise a portion of the Collateral, and the governmental entity shall pay the amount owing on the account free of any claim of setoff or recoupment.

10. For administrative convenience, Secured Party may record the pre-petition transactions and the post-petition transactions arising under the Pre-Petition Agreement in one account, and apply payments on a "first in, first out" basis.

11. The liens granted to Secured Party herein are deemed validly granted, duly attached, and properly perfected, without the need of any additional actions being taken by or on behalf of Secured Party, including but not limited to, the filing or recording of Uniform Commercial Code financing statements; provided, however, that in the event Secured Party does make such a filing or recordation, the Debtor shall execute all documents required by Secured Party to do so.

12. Secured Party shall be the owner of Accounts purchased under the Pre-Petition Agreement and the purchased Accounts and all proceeds there from shall be the sole property of Secured Party, and will not, when purchased by Secured Party, constitute property of the estate, and shall be free and clear of any claims.

13. Nothing in the Pre-Petition Agreement, or in any of the documents executed in connection therewith or this Order, shall require Secured Party to purchase accounts from the

14. Secured Party is hereby afforded the protection of Section 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this Order, or to the modification, vacating, or other amendment of this Order by this Court.

15. The Debtor shall comply with all provisions of the Pre-Petition Agreement.

16. To the extent that any provision of the Pre-Petition Agreement shall cause the Debtor to be in default thereunder solely as a result of it being subject to the Bankruptcy Code or it being insolvent, said provisions are waived by Secured Party.

17. The Debtor shall not grant to any party any interest in the Collateral or priority in payment prior to or equal with the lien or priority in payment hereby being accorded to Secured Party.

18. The entry of this Order and execution, delivery, and performance under the Pre-Petition Agreement, or under any other documents executed in connection therewith, do not constitute a compromise, waiver, or other relinquishment of any right of Secured Party at law, in equity or otherwise, including, but not limited to, any right of Secured Party to request and to obtain relief under the Bankruptcy Code.

19. The automatic stay provisions of 11 U.S.C. Section 362 are terminated to enable Secured Party to implement the provisions of this Order and otherwise thereby to permit Secured Party to demand and receive collections on account of the Collateral, and to apply those collections to the Obligations. Notwithstanding the foregoing, the Secured Party is not hereby granted relief from the automatic stay to enforce any remedies against the Debtor that may be afforded under the Pre-Petition Agreement. In the event a Default occurs under the terms of the Pre-Petition

Agreement, Secured Party shall have a right to notice an expedited hearing before this Court seeking such relief as may be deemed appropriate upon three days' notice to counsel for the Debtor; (ii) counsel for any statutory committee appointed herein or, alternatively, the twenty largest unsecured creditors; (iii) the Office of the U.S. Trustee; and (iv) the United States Attorneys Office.

20. The Debtor may not use any of Secured Party's "cash collateral" as such term is defined in the Bankruptcy Code. For the purposes of this Order, "cash collateral" shall not include funds advanced by the Secured Party to the Debtor. Accordingly any cash collateral hereafter coming into the Debtor's possession shall be paid to Secured Party immediately upon the Debtor's receipt.

21. The Debtor will not propose a Plan of Reorganization that requires Secured Party to accept less than the full amount that the Debtor owes to Secured Party as of the date of commencement of this case.

22. The Debtor will not seek to surcharge the Secured Party or its collateral with any expenses of the type described in Section 506(c) or 552(b) of the Bankruptcy Code unless it obtained Secured Party's prior written consent to the incurrence of such expenses.

23. The Pre-Petition Agreement is enforceable according to its terms and nothing contained therein is unlawful, unenforceable or violative of any usury or similar statute.

24. An event of default under this Order ("Default") shall include the following:

a. the Debtor's failure to perform or comply with any of the terms, conditions, or covenants of this Order;

b. The Debtor's failure to perform or comply with any of the terms, conditions, or covenants of the Pre-Petition Agreement;

c. The termination of this Order by its own terms, operation of law or court order;

d. The dismissal of this Bankruptcy Case;

e. The appointment of a trustee under the Bankruptcy Code;

f. The conversion of the Bankruptcy Case to a case under another chapter of the Bankruptcy Code;

25. Upon the occurrence of a Default, Secured Party shall provide the Debtor written notice of such Default to the Debtor and counsel for the Debtor.  If the Default is a type that is not curable, or is curable by the Debtor and the Debtor fails to cure the Default within five days from the day of service of such notice of the Default:

a. the Debtor shall not seek authority to use any Cash Collateral;

b. the Debtor shall hold and segregate all Cash Collateral in trust for Secured Party and

c. Secured Party shall be entitled to an expedited hearing on a motion for immediate relief from the automatic stay under Section 362 within not less than two (2) Court days from the date of the Default, subject to the Court's calendar (the "Stay Relief Motion").  The only issue for consideration by the Court with respect to the Stay Relief Motion is whether a Default has occurred.

26. Notwithstanding anything to the contrary contained herein, the proceeds of any advance from Secured Party, shall not be used either: (a) in connection with the investigation, assertion, commencement, or continuation of any action or claim against Secured Party or (b) to object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of any rights or claims of the Secured Party.

27. This Order is without prejudice to Secured Party's rights to pursue any and all rights and remedies under the Bankruptcy Code, the Agreement, and any other applicable agreement or

BN 7908087v8

law, including without limitation to seek relief from the automatic stay and/or to seek adequate protection with respect to matters not covered by this Order, to seek an injunction, and/or to object to applications for allowance and/or payment of compensation of professionals employed by the Debtor or its estate.

28. The obligations and indebtedness owed under the Pre-Petition Agreement are valid and indefeasible obligations of the Debtor and its estate, in accordance with their terms; and the liens and security interests in favor of Secured Party with respect to the Collateral are valid, enforceable, perfected, and unavoidable under the Bankruptcy Code, including Section 552, and any other applicable law.

Tendered by:

/s/ Scott A. Bachert
SCOTT A. BACHERT
STEPHANIE L. MCGEHEE-SHACKLETTE
HARNED BACHERT & MCGEHEE PSC
P O Box 1270
Bowling Green, KY 42102-1270
Telephone: (270) 782-3938

## ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT
### (Net Funds Employed)

THIS ACCOUNTS RECEIVABLE PURCHASE AND SECURITY AGREEMENT ("Agreement") is entered into this June 26, 2008, by and between TRANSPORTATION ALLIANCE BANK INC. ("Purchaser") and Ingram Brothers, LLC ("Seller").

1.     Definitions. The following terms used herein shall have the meanings as set forth immediately below.  All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

"Acceptable Account" – see Section 3 hereof.

"Account" – any and all Accounts as defined in the UCC, accounts receivable, any and all amounts owing to Seller under any rental agreement or lease, payments on construction contracts, promissory notes or on any other indebtedness, any rights to payment customarily or for accounting purposes classified as accounts receivable, and all rights to payment, proceeds or distributions under any contract of Seller, presently existing or hereafter created, and all proceeds thereof.

"Account Debtor" – shall mean any individual, corporation, limited liability company, partnership, trust or any other entity or organization obligated for payment of any Account.

"Avoidance Claim" – any claim that any payment received by Purchaser from or for the account of an Account Debtor is an impugned transaction under any bankruptcy, insolvency, preference, corporate or other similar laws.

"Balance Subject to Discount Fee" – the cumulative unpaid balance of the Purchase Price of all outstanding and unclosed Purchased Accounts minus the balance in the Reserve Account.

"Clearance Days" – one (1) business day for checks issued by financial institutions located in Utah, and for electronic funds transfers; and three (3) business days for checks issued by financial institutions not located in Utah, and for any other forms of payment.

"Closed" – a Purchased Account is closed upon the first to occur of (i) receipt of full payment by Purchaser; (ii) the unpaid Face Amount has been charged to the Reserve Account by Purchaser pursuant to the terms hereof; or (iii) if the unpaid Face Amount is two percent (2%) or less of the original Face Amount, or if the original Face Amount was less than $500 then if any payment is received on the Purchased Account that is less than 100%, then said Purchased Account shall be charged to the Reserve Account by Purchaser and the Purchased Account shall be closed. The closure of any Purchased Account by Purchaser shall not be construed so as to relieve Seller of any of its Obligations provided herein.

"Collateral" – any collateral now or hereafter described in any financing statement, continuation statement, financing change statement, amendment or similar filing or registration statement filed against Seller naming Purchaser as the secured party, and all of Seller's right, title and interest in, to and under the following property, now owned or hereafter acquired:

(i) All Accounts (including any Exclusions and any Accounts purchased by Purchaser hereunder and repurchased by Seller), Chattel paper, General intangibles (including, but not limited to, tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists and licenses), Documents, Instruments, securities, deposit accounts, certificates of deposit, and all rights of Seller as a seller of Goods, including rights of reclamation, replevin and stoppage in transit; (ii) All Goods, including, but not limited to, all Inventory, wherever located; (iii) All Equipment and fixtures, wherever located, and all additions, substitutions, replacements (including spare parts), and accessions thereof and thereto; (iv) All books and records relating to all of the foregoing property and interests in property, including, without limitation, all computer programs, printed output and computer readable data in the possession or control of the Seller, any computer service bureau or other third party; (v) All investment property; and (vi) All Proceeds of the foregoing, including but not limited to, all insurance proceeds, all claims against third parties for loss or destruction of or damage to any of the foregoing, and all income from the lease or rental of any of the foregoing.

"Discount Fee Rate" – a per diem rate equal to the rate set forth in Exhibit A attached hereto and incorporated herein by this reference.

"Early Termination Fee" – the Minimum Monthly Fee, for each month (prorated for partial months) that the termination date requested by Seller precedes the termination date of this Agreement as set forth in Section 18 hereof.

"Eligible Account" – an Acceptable Account, that is suitable for purchase as determined by Purchaser in the exercise of Purchaser's sole and absolute discretion and judgment.

"Events of Default" – see Section 16 hereof.

"Exclusions" – see Exhibit A attached hereto and incorporated herein by this reference.

Exhibit A

"Face Amount" – the total amount due specified on an Account's invoice, at the time of Purchase, less any finance charges included therein.

"Guarantor" – the Person(s) guaranteeing the payment and performance of the Obligations, as are set forth in Exhibit A, attached hereto and incorporated herein by this reference.

"Late Charge" – see Exhibit A attached hereto and incorporated herein by this reference.

"Late Payment Date" – the date which is ninety days from the invoice date or any other such time period as deemed necessary or appropriate by Purchaser.

"Maximum Amount" – see Exhibit A attached hereto and incorporated herein by this reference or such other amount as Purchaser shall deem appropriate in its sole discretion.

"Minimum Monthly Fee" – see Exhibit A attached hereto and incorporated herein by this reference.

"Misdirected Payment Fee" – fifteen percent (15%) of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next business day following the date of receipt by Seller.

"Notation" – "This account has been assigned and is payable directly to Transportation Alliance Bank Inc., located at 4185 Harrison Blvd., Suite 200, Ogden, Utah 84403, to whom notice of any claim or dispute must be advised, either in writing or by telephone to (801) 334-4800. Payments should be made payable to Transportation Alliance Bank Inc. and should be mailed to Transportation Alliance Bank Inc., P.O. Box 150290, Ogden, Utah 84403-9902."

"Obligation" – all present and future obligations owing by Seller to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any bankruptcy, insolvency or other similar proceeding in which Seller is a debtor or an insolvent debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

"Parties" – Seller and Purchaser.

"Person" – an individual, corporation, limited liability company, partnership, trust or any other legal entity or organization in which Seller has an interest.

"Purchased Accounts" – Accounts purchased hereunder which have not been Repurchased.

"Purchased Account Administration Fee" - the initial administration fee charged by Purchaser to Seller for each Account purchased by Purchaser equal to the Face Amount of each Purchased Account multiplied by the Purchased Account Administration Fee Percentage.

"Purchased Account Administration Fee Percentage" – see Exhibit A, attached hereto and incorporated herein by this reference.

"Purchase Date" – the date on which Seller has been advised in writing that Purchaser has agreed to purchase an Account.

"Purchase Price" – the Face Amount of the Purchased Account less the Purchased Account Administration Fee.

"Repurchased" – subject to the terms and conditions set forth herein, an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount upon demand by Purchaser under the terms hereof.

"Required Reserve Amount" – the cumulative total of the respective Reserve Percentage for each Purchased Account multiplied by the unpaid balance of each such Purchased Account.

"Reserve Account" – the establishment and maintenance of one or more bookkeeping accounts on the books of Purchaser, as deemed necessary or appropriate by Purchaser, to effectuate the terms and conditions set forth herein or otherwise ensure Seller's performance with the provisions hereof.

"Reserve Percentage" – the percentage set forth in Exhibit A attached hereto and incorporated herein by this reference, or such other percentage as Purchaser shall deem appropriate in its sole discretion.

Exhibit A

"Reserve Shortfall" – the amount by which the Reserve Account is less than the Required Reserve Amount.

"Schedule of Accounts" – a form supplied by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms hereof, and from which Purchaser may elect to purchase all or any portion of said Accounts without further notification to Seller being required hereunder.

"Seller's Account" – any demand deposit account maintained by Seller or represented by an employee of Seller to be maintained by Seller, or any other account of Seller into which Seller directs Purchaser to make advances or payments of any obligations owed by Purchaser to Seller.

"Serviced Account" – an Account that is not purchased by Purchaser hereunder, but which invoice and other documentation underlying said Account is forwarded by Purchaser, on behalf of Seller, to the Account Debtor for payment.

2.       **Submission of Accounts to Purchaser.**  Seller shall be required hereunder to submit all of Seller's Accounts to Purchaser, excluding only the Accounts of those Account Debtors specifically excluded in Exhibit A, attached hereto and incorporated herein by this reference. Seller shall submit said Accounts within seven (7) days of the date the goods are sold or delivered, or services performed giving rise to the Account are completed. Seller shall submit the Accounts via Schedule of Accounts or at Purchaser's sole discretion and judgment, Seller shall, on at least a weekly basis, send or make available to Purchaser via electronic file, any and all Accounts to be purchased by Purchaser. Seller hereby agrees that each electronic file submitted or made available by Seller hereto shall contain all necessary fields of information as required by Purchaser and shall be in a format acceptable to Purchaser such that Purchaser shall be able to purchase the Accounts pursuant to the terms and conditions herein. Seller hereby acknowledges and agrees that Purchaser shall at no time be liable or responsible to Seller for any errors in connection with the electronic file either directly or indirectly, including but not limited to, file transfer errors, content errors, format errors of any other errors in connection thereto. Seller expressly understands that it is the sole responsibility of Seller to ensure the successful transmission of Accounts to Purchaser either via Schedule of Accounts or electronically. Seller acknowledges and agrees that Purchaser is under no obligation to purchase any Account that is submitted to Purchaser. Any Account that is not purchased by Purchaser shall be deemed a Serviced Account; and shall, at Purchaser's option, either be (i) returned to Seller, or (ii) forwarded by Purchaser to the respective Account Debtor for payment. In the event Purchaser forwards a Serviced Account on to the Account Debtor, Seller shall pay Purchaser a processing fee equal to $5.00 for each such Serviced Account, said fee to be charged against Seller's Reserve Account. Purchaser shall be authorized to deduct said fee from any amounts owed by Purchaser to Seller. Purchaser's only obligation with regard to a Serviced Account shall be to forward it to the Account Debtor, and to process any collections received by the Account Debtor on the Serviced Account. Purchaser shall deposit in Seller's Reserve Account any funds collected on Serviced Accounts, upon Purchaser's receipt of cleared funds from the Account Debtor. If any payments so received are returned as not collectable or NSF, then Purchaser shall notify Seller, whereupon Purchaser shall have no further obligations with regard to the Serviced Account; and Seller may then pursue whatever collection efforts from the Account Debtor that it deems appropriate.

3.       **Acceptable Accounts.**  Purchaser will only consider for purchase those Accounts of Seller that are Acceptable Accounts. To be an Acceptable Account, an Account must meet all of the following requirements and conditions: (i) the Account shall be evidenced by a daily, monthly and/or master invoice, as required by Purchaser in its sole discretion and judgment, submitted to Purchaser, in duplicate, meeting the following conditions: (a) contain the Seller's name, invoice number and date, (b) contain the full and complete name and address of the Account Debtor, (c) clearly set forth the amount owing and to be collected by Purchaser, (d) state the due date and any other terms for payment of the Account, (e) be completely legible, (f) contain the Account Debtor's applicable purchase order or load number, if any, (g) be accompanied by such other documents as are required by Purchaser, including but not limited to, confirmation statements, executed driver manifests, service contracts, task orders any and all service acceptances and any and all other documents deemed necessary or appropriate by Purchaser, and (h) receive credit approval and be accepted by Purchaser; (ii) the Account shall be submitted to Purchaser within seven (7) days of the date the goods are sold or delivered, or services performed giving rise to the Account are completed, except as otherwise approved in writing by Purchaser; (iii) the invoice shall be accompanied by proof of acceptance, delivery (including at a minimum the original signed bill of lading or at Purchaser's sole discretion and judgment, an electronic image or copy of the signed bill of lading), or shipment of goods, or performance of services as is acceptable to Purchaser. Seller understands and agrees that at Purchaser's sole discretion, Purchaser may at any time request any and all original documentation or copies thereof, including but not limited to, original signed bills of lading or electronic images thereof, from Seller or any Account Debtor of Seller and Seller agrees to promptly send and hereby authorizes any such Account Debtor to release, in a form and format requested, all such requested documentation to Purchaser. Seller further agrees to maintain, safeguard, backup and store any and all such records and documentation directly or indirectly connected hereto; and (iv) the Account shall meet and comply with the following conditions: (a) Seller has sole and unconditional good title to the Account, the Account and any goods sold to create the Account being free from any other security interest, assignment, lien or other encumbrance of any type, (b) the Account is a bona fide obligation of the Account Debtor for the Face Amount and there have been no payments, deductions, credits, payment terms, or other modifications or reductions in the amount owing on such Account except as set forth on the face of the invoice, (c) there are no defenses or setoffs to payment of the Account which can be asserted by way of defense or counterclaim against Seller or Purchaser, (d) the Account will be timely paid in full by the Account Debtor, (e) any services performed or goods sold which give rise to the Account have been rendered or sold and delivered in compliance with all applicable laws, ordinances, rules and regulations and were performed or sold in the ordinary course of Seller's business, (f) there have been no extensions, modifications or other agreements relating to payment of such Account except as shown upon the face of the invoice, (g) the

AR Form 7: Rev 1/15/08                                                3

Exhibit A

Account Debtor is located or authorized to do business within the United States, and (h) no proceeding has been commenced or petition filed under any bankruptcy or insolvency law by or against the Account Debtor, no receiver, trustee or custodian has been appointed for any part of the property of the Account Debtor, and no property of the Account Debtor has been assigned for the benefit of creditors.

### 4. Sale; Purchase Price; Billing; Reserve.

**Sale.** Seller shall sell to Purchaser as absolute owner, such of Seller's Accounts as are listed from time to time on Schedules of Accounts. Each such Schedule shall be accompanied by such documentation supporting and evidencing the Account as Purchaser shall from time to time request. Purchaser may purchase from Seller such Accounts as Purchaser determines to be an Eligible Account, so long as the total outstanding Face Amount of all Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount. Purchaser's purchase of Eligible Accounts is at its sole discretion, and Purchaser shall have no obligation to purchase any Account from Seller. Purchaser may decline to purchase any Account submitted by Seller for any reason or for no reason, without notice, regardless of any course of conduct or past purchase of Accounts by Purchaser. Purchaser shall be the sole and exclusive purchaser or factor for Seller's Accounts. Seller will not sell, factor or otherwise finance its accounts receivable except with Purchaser.

**Purchase Price.** At the request of Seller, Purchaser shall pay all or any portion of the Purchase Price, less any amounts due to Purchaser from Seller, including, without limitation, any Reserve Shortfall, and less any fees, at the Discount Fee Rate, on the Balance Subject to Discount Fee that has accrued but has not yet been paid by Seller, of any Purchased Account, from time to time to Seller's Account. Any portion of the Purchase Price, that Seller has not requested to be paid to Seller's Account, shall be held in the Seller's Reserve Account.

**Billing.** Purchaser may send a monthly statement to all Account Debtors itemizing their account activity during the preceding billing period. All Account Debtors will be instructed to make payments to Purchaser.

**Reserve.** Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall. Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

Purchaser may pay to Seller any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount; provided, that no Event of Default exists hereunder, and provided further that Purchaser, in its sole discretion and acting in good faith, has no concerns about Seller's ability to continue to perform its Obligations hereunder. Payment by Purchaser of said funds to Seller shall be made in accordance with any written instructions of Seller which are agreed to by Purchaser. Unless otherwise instructed by Seller, payments shall be made by the mailing of a check to Seller.

Purchaser may charge the Reserve Account with any Obligation, including any amounts due from Seller to Purchaser hereunder. Purchaser may pay any amounts due Seller hereunder by a credit to the Reserve Account. Upon termination of this Agreement, Purchaser may retain the funds in the Reserve Account for ninety days thereafter, or at Purchaser's option for so long as any Obligations remain outstanding, to be applied to payment of any Obligations which were unknown to Purchaser at the time of termination.

5. **Collection Procedures.** Purchaser shall have the exclusive right to collect any and all Accounts whether purchased by Purchaser or otherwise and receive payments thereon. Seller shall not bill for, submit any invoice, or otherwise attempt to collect or interfere with the collection of any Accounts except as authorized in writing by Purchaser. Seller shall promptly and completely respond to all requests from Purchaser for any information or records requested to assist in the collection of said Accounts. If Seller fails to respond to any such request within seven (7) days, Purchaser may, where applicable, require Seller to Repurchase the Account. Seller may authorize Purchaser to revise the amount of or otherwise modify an Account. Purchaser shall have no obligation to advise the Account Debtor of such revision except to send the Account Debtor any revised invoice, which may be provided to Purchaser by Seller. In the event such revision results in a reduction in the amount owing on any Account, Purchaser may, where applicable, require Seller to Repurchase said Account.

In the event an Account Debtor makes payment to Seller on a Purchased Account, Seller shall immediately deliver the payment to Purchaser. If payment is made in cash, such payment shall be immediately delivered to Purchaser. If payment is made by check or similar instrument, such instrument shall be immediately delivered to Purchaser in the form received without negotiation. Upon inquiry from the Account Debtor or upon request of Purchaser, Seller shall notify the Account Debtor to make payment directly to Purchaser. Any payments received by Seller on Purchased Accounts shall be held in trust by Seller for Purchaser.

Seller shall immediately notify Purchaser of any dispute between Seller and an Account Debtor concerning a Purchased Account, and of any bankruptcy filing, lien, garnishment or other legal action concerning said Accounts. Purchaser shall make a good faith, commercially reasonable effort to collect the Purchased Accounts. It is agreed that the collection of Accounts in a commercially reasonable manner does not require, and Purchaser shall have no obligation to commence any legal action, including the sending of an attorney's demand letter, to collect any Account. Seller hereby waives and releases any and all claims relating to or arising out of any act or omission by Purchaser in the collection of the Purchased Accounts and Serviced Accounts, only intentional misconduct excepted. Upon request of Purchaser, Seller will cause all payments on all Accounts of

Seller, whether or not Purchased Accounts, to be sent directly to such address as may be designated by Purchaser. Purchaser is authorized to receive and open all such payments and retain such amounts as are owing to Purchaser. Upon request of Purchaser, Seller will tender to Purchaser all payments received by Seller from an Account Debtor on Accounts created after Seller begins offering any Accounts of that Account Debtor for purchase by Purchaser. Upon such request being made, all such payments received by Seller shall be the sole and exclusive property of Purchaser and shall be held in trust by Seller for Purchaser. All such payments shall be applied on obligations of that Account Debtor to Purchaser. In the event Purchaser receives any payment from an Account Debtor on an Account which is not a Purchased Account, Purchaser may, subject to any rights of the Account Debtor, apply such payment to any other Obligation of Seller owing to Purchaser, including, without limitation, funding of any Reserve Shortfall.

Seller acknowledges and agrees that it has no right, title or interest whatsoever in the funds constituting payment of a Purchased Account, that said funds are the sole and exclusive property of Purchaser, and that any use of or interference with said funds by Seller may result in civil and criminal liability.

6.      **Authorization for Purchase**. Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

7.      **Fees and Expenses**. Seller shall pay to Purchaser: (i) discount fees, at the Discount Fee Rate, on the Balance Subject to Discount Fee, from the date upon which an Account is purchased hereunder, said discount fee shall be paid monthly on the first day of the month following the month in which it accrues; (ii) the Purchased Account Administration Fee on each Purchased Account; (iii) any Misdirected Payment Fee immediately upon its accrual; (iv) any amount by which the sum of the fees and charges earned in any month (prorated for partial months) is less than the Minimum Monthly Fee, to be paid on the first day of the following month; (v) the Early Termination Fee if Seller terminates this Agreement or prepays the Obligations (whether by acceleration or otherwise), prior to the termination date set forth herein, computed from the date of termination to the date on which termination is requested by Seller pursuant to Section 18 hereof; (vi) the Late Charge on all past due amounts due from Seller to Purchaser hereunder, and on the amount of any Reserve Shortfall; (vii) any and all other fees and charges referred to herein, at the time required by the terms hereof; and (viii) the out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement such as wire transfer fees, postage, extra-ordinary collection costs, periodic UCC or tax lien searches, and audit fees, calculated at Purchaser's standard fee schedule, a copy of which will be provided to Seller upon request. Any amounts owed by Seller to Purchaser shall be paid by Seller, at Purchaser's option, by: (a) charging said amounts to the Reserve Account; (b) deducting said amounts from the Purchase Price otherwise directed by Seller to be deposited into Seller's Account; (c) debiting said amounts from Seller's Account; or (d) Seller's paying said amounts, in cash or other good funds acceptable to Purchaser, immediately upon demand made by Purchaser.

8.      **Repurchase of Accounts**. Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof, together with any unpaid fees relating to the Purchased Account on demand: (i) any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, or upon which the Account Debtor has taken any offsets, credits, discounts and/or short pays, Purchaser being under no obligation to determine the bona fides of such dispute; (ii) all Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement; and (iii) any Purchased Account which remains unpaid beyond the Late Payment Date or in which Purchaser for any reason, in good faith, believes that such Purchased Account will not be paid by the Account Debtor. Seller agrees that any repurchase pursuant to the terms and conditions herein shall not authorize Seller to collect any outstanding sum owing on a Repurchased Account from an Account Debtor and Purchaser may in its sole judgment and discretion charge any and all amounts owed by Seller herein to Seller's Reserve Account. Seller further agrees that any and all repurchase requirements herein shall be considered paid to Purchaser only after all payment and performance obligations owing to Purchaser by Seller have been indefeasibly paid in full.

9.      **Security Interest**. As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority perfected security interest in, to and under the Collateral. Notwithstanding the creation of said security interest, the relationship of the parties shall be that of Purchaser and Seller of Accounts, and not that of lender and borrower.

10.     **Clearance Days**. For all purposes under this Agreement, Clearance Days will be added to the date on which any payment is received by Purchaser.

11.     **Authorization to Purchaser**. Seller hereby irrevocably authorizes Purchaser at Seller's expense, to exercise at any time any of the following powers until all of the Obligations have been paid in full: (i) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof; (ii) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the Accounts and other Collateral; (iii) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller; (iv) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor (including filing of any public record releasing any lien granted to Seller by such Account Debtor), without affecting any of the Obligations; (v) execute in the name of Seller and file against Seller in favor of Purchaser financing statements or amendments with respect to the

Exhibit A

Collateral; (vi) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and shall be due and payable; (vii) file in the name of Seller or Purchaser or both: (a) mechanic's lien or related notices or (b) claims under any payment bond, in connection with goods or services sold by Seller in connection with the improvement of realty; and (viii) notify any Account Debtor obligated with respect to any Account, including but not limited to any and all Exclusions as described in Exhibit A, that the underlying Account has been assigned to Purchaser by Seller and that payment thereof is to be made to the order of and directly and solely to Purchaser.

Seller authorizes Purchaser to accept, indorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser effects an accord and satisfaction of Seller's claims, under Section 3-311 of the Uniform Commercial Code, or otherwise.

In order to satisfy any of the Obligations, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH system to Seller's Account or any other deposit account maintained by Seller wherever located. Seller may only terminate this authorization by giving Purchaser thirty (30) days' prior written notice of termination.

12. **Covenants by Seller.** Seller shall not, without the prior written consent of Purchaser in each instance: (i) grant any extension of time for payment of any of the Accounts or any other Collateral which includes a monetary obligation, (ii) compromise or settle any of the Accounts or any such other Collateral for less than the full amount thereof, (iii) release in whole or in part any Account Debtor or other person liable for the payment of any of the Accounts or any such other Collateral, (iv) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Accounts or any such other Collateral, (v) change the nature of its business or its place of incorporation, (vi) declare or pay any dividend or make any other distribution or payment in respect of its shares of stock or purchase or redeem any of its shares of stock, (vii) merge or consolidate with any corporation or other entity or liquidate or dissolve, (viii) adopt or agree to adopt any plan providing for its reorganization, (ix) make any loan or other extension of credit, (x) issue any guarantee or otherwise incur any contingent liability; or (xi) sell, pledge, transfer, assign or grant a security interest in any of the Collateral or any of the Seller's other assets.

From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to any Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. Without expense to Purchaser, Purchaser may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Purchaser, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

Before sending any invoice evidencing an Account to an Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require. Seller shall not create, incur, assume or permit to exist any lien upon or with respect to any Collateral now owned or hereafter acquired by Seller.

Seller shall maintain insurance on all insurable property owned or leased by Seller in the manner, to the extent and against at least such risks (in any event, including but not limited to fire and business interruption insurance) as usually maintained by owners of similar businesses and properties in similar geographic areas. All such insurance shall be in amounts and form and with insurance companies acceptable to Purchaser in its sole discretion. Seller shall furnish to Purchaser: (i) upon written request, any and all information concerning such insurance carried; and (ii) as requested by Purchaser, lender loss payable endorsements (or their equivalent) in favor of Purchaser. All policies of insurance shall provide for not less than thirty (30) days' prior written cancellation notice to Purchaser.

Seller agrees to maintain auto liability, casualty and cargo insurance with a responsible insurance company reasonably acceptable to Purchaser in such amounts and against such risks as is usually carried by responsible companies engaged in similar business; and cause Purchaser to be designated as additional insured with respect to such insurance; obtain the certification of such insurer that such insurance shall not be cancelled or terminated, nor shall the coverage or terms or exclusions thereof be materially modified without at least thirty (30) days prior written notice to Purchaser.

Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to the terms hereof, Seller shall deliver in kind to Purchaser on the next banking day following the date of receipt by Seller the amount of any payment on account of a Purchased Account. Seller shall indemnify Purchaser from any loss arising out of the assertion of any Avoidance Claim. Seller shall notify Purchaser within two (2) business days of it becoming aware of the assertion of an Avoidance Claim.

Exhibit A

Seller agrees to submit financial statements to Purchaser, upon Purchaser's request, and Seller shall cause anyone guaranteeing Seller's Obligations hereunder to submit financial statements for such Guarantor to Purchaser as may be requested by Purchaser. All such financial statements shall be prepared in accordance with generally accepted accounting principles and shall be in a form and from an accounting firm acceptable to Purchaser. Seller hereby represents and warrants that all financial statements of Seller, and of any Guarantor submitted to Purchaser shall fairly present the financial condition of Seller and any such Guarantor as of the date thereof and the results of operations for the period or periods covered thereby. Seller further represents and warrants, that since the date of the most recent financial statements, there has been no material or adverse change in the financial condition of Seller or any such Guarantor.

Seller hereby consents to Purchaser's disclosing to any third party, any and all information, knowledge, reports and records, including, without limitation, financial statements, concerning Seller or any Guarantor.

**13.** **Account Disputes.** Seller shall notify Purchaser promptly of any and all disputes concerning any Purchased Account and shall, if requested by Purchaser, immediately settle any such dispute, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deems advisable, for Seller's account and risk at Seller's sole expense. Upon the occurrence of an Event of Default, Purchaser may Resolve such issues with respect to any Account of Seller.

**14.** **Perfection of Security Interest.** Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, Uniform Commercial Code financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any Collateral securing the Obligations. Seller hereby agrees to pay in full any and all amounts owing to Purchaser arising from any actions taken by Purchaser to ensure the priority of its security interest in the Collateral, including but not limited to any and all Uniform Commercial Code searches.

**15.** **Representations and Warranties.** Seller represents and warrants that: (i) Seller has and shall maintain the full power and authority to own its assets and to conduct the business in which it engages and to enter into and perform its Obligations under this Agreement; (ii) this Agreement constitutes a legal, valid and binding obligation of Seller; (iii) Seller is solvent; (iv) Seller has been duly organized or incorporated, as the case may be, and is in good standing, under the laws of the state of its organization or incorporation; (v) the place of business of Seller, or, if Seller has more than one place of business, the location of its chief executive office is the location noted in Section 27 hereof, and will not be moved therefrom without at least thirty (30) days' prior written notice to Purchaser; (vi) all records of Seller pertaining to the Purchased Accounts shall be kept and stored in the location noted in Section 27 hereof, and will not be moved therefrom without at least thirty (30) days' prior written notice to Purchaser; (vii) Seller is duly qualified to do business and is in good standing in each jurisdiction where the conduct of its business requires such qualification; (viii) Seller has all necessary licenses and other certificates or permits required for the conduct of its business and all such necessary licenses and other certificates or permits are current and will be maintained at all times; (ix) the execution, delivery and performance by Seller of this Agreement have been duly authorized by all necessary action on the part of Seller, and are not inconsistent with any Articles of Incorporation, Articles of Organization, By-Laws, Partnership Agreement, or other organizational documents of Seller, do not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract or other instrument to which Seller is a party or by which it is bound, and upon execution and delivery hereof, this Agreement will constitute a legal, valid and binding agreement and obligation of Seller, enforceable in accordance with its terms; (x) Seller shall conduct its business in a lawful manner and in compliance with all applicable federal, state and local laws, ordinances, rules, regulations, and orders and shall pay when due all lawfully imposed taxes upon its property, business and income; (xi) there is no pending or threatened action or proceeding against or affecting Seller before any court, governmental agency or arbitrator, which may, in any one case or in the aggregate, materially adversely affect the financial condition, operations, properties or business of Seller to perform its Obligations under this Agreement; (xii) Seller has satisfied all judgments, and Seller is not in default with respect to any judgment, writ, injunction, state decree, rule or regulation of any court, arbitrator or federal, municipal, or other governmental authority, commission, board, bureau, agency or instrumentality; and (xiii) this Agreement, the financial statements referred to herein, and all other statements furnished by Seller to Purchaser in connection herewith contain no untrue statement of a material fact and omit no material fact necessary to make the statements contained therein or herein not misleading.

**16.** **Default; Events of Default; Waiver; and Effect.** The following events will constitute an Event of Default hereunder: (i) Seller defaults in the payment of any Obligations or in the performance of any provision hereof or of any other agreement now or hereafter entered into with Purchaser, or any warranty or representation contained herein proves to be false in any way, howsoever minor; (ii) Seller or any Guarantor of the Obligations becomes subject to any debtor-relief proceedings; (iii) any such Guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever; and/or (iv) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

Seller waives any requirement that Purchaser inform Seller by affirmative act or otherwise of any acceleration of Seller's obligations hereunder. Further, Purchaser's failure to charge or accrue interest or fees at any "default" or "past due" rate shall not be deemed a waiver by Purchaser of its claim thereto.

Exhibit A

Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall become immediately due and payable without notice. The Late Charge shall accrue and be payable on demand on any Obligation not paid when due.

No failure to exercise and no delay in exercising any right, power or remedy hereunder shall impair any right, power or remedy which Purchaser may have, nor shall any such delay be construed to be a waiver of any of such rights, powers or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Purchaser of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Purchaser hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies which Purchaser would otherwise have. Any waiver, permit, consent or approval by Purchaser of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance; and shall not be effective until Seller has paid to Purchaser a $50.00 default waiver fee.

**17.    Account Stated.** Purchaser shall render to Seller a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Seller as an account stated, except to the extent that Purchaser receives, within ninety (90) days after the mailing of such statement, written notice from Seller of any specific exceptions by Seller to that statement, and then it shall be binding against Seller as to any items to which it has not objected.

**18.    Termination; Effective Date.** This Agreement will be effective when accepted by Purchaser, will continue in full force and effect for the term set forth in Exhibit A, attached hereto and incorporated herein by this reference; and shall be further extended automatically for successive one (1) year periods, unless Seller shall have given Purchaser written notice of its intention to terminate at least sixty (60) days prior to the expiration of the original term or any renewal period, whereupon this Agreement shall terminate on said date. Upon termination Seller shall pay the Obligations to Purchaser.

**19.    Use of Fuel Card.** Seller acknowledges and agrees that Purchaser has a legitimate and reasonable need to assess the soundness and validity of Seller's credit throughout the duration of this Agreement. Seller agrees that for this purpose, Seller shall utilize a fuel card designated by or specifically approved by Purchaser for all fuel transactions or such other number or percentage of transactions as deemed necessary or appropriate by Purchaser in its sole discretion and judgment, in order that Purchaser may reasonably monitor its secured interest in Seller's Collateral and Seller's financial viability.

**20.    Document Imaging.** Seller acknowledges and agrees that in order for Purchaser to maintain the ability to effectively monitor any and all Collateral granted to Purchaser by Seller as provided in this Agreement, Seller shall establish and at all times maintain a document imaging system or other electronic document scanning and storage program whereby any and all documentation of Seller, either directly or indirectly related to any Account or otherwise used in the operation of Seller's business, is electronically imaged and stored for a period determined solely by Purchaser. Seller shall obtain the express written approval of Purchaser prior to obtaining or utilizing the services of an independent third party for imaging services and storage and shall, if said third party is approved by Purchaser in its sole discretion and judgment, authorize said third party to release or grant to Purchaser the access as described herein and shall cause said third party to maintain all electronic data of Seller for a period determined solely by Purchaser.

**21.    Information Access.** Seller agrees to submit to Purchaser, on at least a monthly basis, a complete and accurate aging detail, including but not limited to, any and all aging and payable information and detail, either directly or indirectly, related to or with Seller, its parent, affiliates or subsidiaries as requested by Purchaser in its sole discretion and judgment. Seller acknowledges and agrees that all such aging and payable information and detail shall be prepared in a form and format acceptable to Purchaser.

Seller further agrees to provide to Purchaser unrestricted access to any and all information, data, reports, analyses, compilations, studies, interpretations, and other materials, regardless of the form maintained whether documentary, computerized, electronic, oral or otherwise, concerning Seller or its business or personnel. Such access shall include but not be limited to, providing Purchaser with unrestricted access to any and all computer systems (proprietary or otherwise), equipment tracking systems, document scanning or other imaging systems, dispatch systems, financial transaction systems or any other software or manual system used directly or indirectly by Seller in the normal course and scope of operating its business. Seller further agrees to provide Purchaser with any and all resources necessary to enable Purchaser to electronically effectuate or establish the herein described access.

**22.    Choice of Law and Venue.** This Agreement and all transactions or disputes arising directly or indirectly hereunder shall be governed by, construed under and enforced in accordance with the internal laws of the State of Utah. The Parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement shall, if Purchaser so elects, be instituted in the United States District Court for the District of Utah, or in the Second District Court for the State of Utah (the "Acceptable Forums"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Utah or otherwise in those courts in any such suit, action or proceeding. Should

Exhibit A

such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Purchaser as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

23.     **Attorneys Fees.** Seller agrees to reimburse Purchaser on demand for: (i) the actual amount of all costs and expenses, including attorneys' fees, which Purchaser has incurred or may incur in: (a) negotiating, preparing, or administering this Agreement and any documents prepared in connection herewith, all of which shall be paid contemporaneously with the execution hereof, (b) any way arising out of this Agreement, and (c) protecting, preserving or enforcing any lien, security interest or other right granted by Seller to Purchaser or arising under applicable law, whether or not suit is brought, including but not limited to the defense of any Avoidance Claim; (ii) the actual costs, including photocopying (which if performed by Purchaser's employees shall be at the rate of $.25/page), travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party; and (iii) either (the choice of which shall be in the sole discretion of Purchaser): (a) the actual amount of all costs and expenses, including attorney's fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (1) arising out of the automatic stay, (2) contesting dischargeability or seeking dismissal or conversion of the bankruptcy proceeding or (3) opposing confirmation of Seller's plan thereunder; or (b) 20% of the amount of the claim of Purchaser against Seller, which Seller agrees shall constitute a reasonable substitute for such actual fees and expenses. Any such costs and expenses incurred subsequent to the execution hereof shall become part of the Obligations when incurred and may be added to the outstanding principal amount due hereunder.

24.     **Jury Trial Waiver.** IN RECOGNITION OF THE HIGHER COSTS AND DELAYS WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING HEREUNDER, OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY; AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHTS TO TRIAL BY JURY.

25.     **Limitation of Liability.** In consideration of Purchaser accepting the Accounts of Seller for purchase, Seller hereby releases and exculpates Purchaser, its officers, employees and designees, upon each submission of Accounts to Purchaser by Seller, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. Moreover, Purchaser shall at no time be liable to Seller for any and all damages sustained by Seller due to revocation, suspension, interruption, or termination of Seller's Agreement. IN NO EVENT SHALL PURCHASER BE RESPONSIBLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES, REGARDLESS OF WHETHER OR NOT PURCHASER WAS MADE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. PURCHASER MAKES NO REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ANY REPORTS, RECOMMENDATIONS, DETERMINATIONS, ANALYSIS, OR ANY OTHER SERVICES (COLLECTIVELY REFERRED TO HEREIN AS "SERVICES") PROVIDED BY PURCHASER IN CONJUNCTION WITH PURCHASER'S PERFORMANCE IN CONNECTION WITH THIS AGREEMENT ARE MADE WITHOUT REPRESENTATION OR WARRANTY WITH REGARD TO THE VALIDTY OR RELIABILITY OF SUCH SERVICES. SELLER UNDERSTANDS AND AGREES THAT SELLER SHALL BEAR FULL RESPONSIBILITY AND ACCOUNTABILITY FOR ANY DECISION MADE BY SELLER AS A RESULT OF SUCH SERVICES PROVIDED BY PURCHASER HEREUNDER. Under no circumstances shall the financial responsibility of Purchaser for any failure of performance by Purchaser under this Agreement exceed the fees or charges paid to Purchaser for the transaction, activity or service that is or was the subject of the alleged failure of performance. Without limiting the generality of any of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

26.     **Miscellaneous.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given orally (even if supported by new consideration), but only by an instrument in writing signed by all Parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any termination or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form reasonably satisfactory to Purchaser. Seller understands that this provision constitutes a waiver of its rights under Section 9-513 of the UCC.

Exhibit A

Unless otherwise expressly stated in any other agreement between the Parties, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this Agreement shall control. All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory. In the event any one or more of the provisions contained in this Agreement is held to be invalid, illegal or unenforceable in any respect, then such provision shall be ineffective only to the extent of such prohibition or invalidity, and the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

This Agreement and all agreements relating to the subject matter hereof are the product of negotiation and preparation by and among each party and its respective attorneys, and shall be construed accordingly. Except as specifically provided herein, the relationship of the Parties hereto shall be that of seller and purchaser of accounts, and neither party is or shall be deemed a fiduciary of or to the other.

This Agreement, the documents or instruments referred to herein and all subsequent amendments, modifications or substitutions, embody the entire agreement and understanding of the parties hereto with respect to the subject matter herein. No promises of any kind have been made by Purchaser or any third party and Seller has not relied upon any promises, representations, warranties (either express or implied), agreements, covenants or undertakings, other than those expressly set forth or referred to herein. This Agreement shall supersede all prior agreements and understandings between the parties with respect to such subject matter hereof and no course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

This Agreement is not assignable or transferable by Seller and any such purported assignment or transfer is void. This Agreement shall be binding upon the successors of Seller, including any and all successor Persons. Purchaser is hereby authorized to file UCC financing statements against any such successor, and Seller shall hold Purchaser harmless from any loss or liability resulting from or arising out of Purchaser's actions against said successors. Purchaser is also authorized to contact any lender or factor of the successor Person. Seller acknowledges and agrees that Purchaser may assign all or any portion of this Agreement including, without limitation, assignment of the rights, benefits and remedies of Purchaser hereunder without any assignment of the duties, obligations or liabilities of Purchaser hereunder.

27.     **Notice.** All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of (i) deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means, including facsimile, to a receiver under the control of such party, or (iii) actual receipt by such party or an employee or agent of such party. All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser.

For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

| | |
|---|---|
| SELLER: | Ingram Brothers, LLC |
| Address: | 218 Industrial Drive North |
| | Morgantown, KY 42261- |
| Officer: | Dennis P. Ingram |
| Fax Number: | (270) 526-5893 |

| | |
|---|---|
| PURCHASER: | Transportation Alliance Bank Inc. |
| Address: | 4185 Harrison Blvd., Suite 200 |
| | Ogden, UT 84403 |
| Officer: | Joe Couture |
| Fax Number: | (801) 395-8672 |

Exhibit A

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**SELLER:**
Ingram Brothers, LLC

By: _____
Name: Dennis P. Ingram
Title: Member

STATE OF Kentucky )
                              )ss.
COUNTY OF Butler )

On this _18_ day of _July_____, 2008, before me, the undersigned notary, personally appeared Dennis P. Ingram, who being by me duly sworn did state, that he/she is the Member of Ingram Brothers, LLC, the corporation/partnership/limited liability company/sole proprietorship that executed the within instrument, and acknowledged to me that such corporation/partnership/limited liability company/sole proprietorship executed the same and that he/she was authorized to execute said instrument.

NOTARY       my hand and official seal.

PUBLIC

_____
Notary Public

My Commission Expires:                    Residing At:
6/7/12                                       Morgantown Ky

**PURCHASER:**
TRANSPORTATION ALLIANCE BANK INC.

By: _____
Name: David E. Smoot
Title: Vice President/General Counsel
Date: _1 August 2008_

Exhibit A

## EXHIBIT A

Discount Fee Rate: A per diem rate equivalent to the sum of the "Prime Rate" plus 2.25%, divided by 360 days. The Discount Fee Rate, however, shall at no time be less than 4.75% divided by 360 days (0.01666667% per diem). "Prime Rate" as used herein shall be the "prime rate" established by the Chase Manhattan Bank, N.A. ("Chase"), from time to time. Purchaser, in its sole discretion, shall determine the applicable "prime rate" established by Chase, and shall increase or decrease the Discount Fee Rate accordingly. Any change in the Discount Fee Rate shall be effective as of the first business day following any change in the Prime Rate. As of the date hereof, the Prime Rate is 5 %, and the corresponding Discount Fee Rate is 0.02013888 % per diem.

| Late Charge: | 0.08% per diem |
|---|---|
| Maximum Amount: | $1,100,000.00 |
| Minimum Monthly Fee: | $5,500.00 |
| Purchased Account Administration Fee Percentage: | 0.25% |
| Reserve Percentage: | 10% |
| Term of Agreement: | 24 months |
| Guarantor: | Dennis P. Ingram<br>Eric P. Ingram<br>Jay R. Ingram<br>Chase L. Ingram |
| Exclusions: | None |

Initials
Title

Exhibit A

## TAB Fuel Line Agreement
## APPLICANT'S REPRESENTATIONS AND AGREEMENTS

Applicant hereby applies to Transportation Alliance Bank Inc., ("TAB") for fuel line credit privileges as designated in this Agreement, which extension of credit, if any, shall be made to Applicant for the purchase of fuel through the TCH Fleet Fuel Card platform. All privileges, information reporting services and any other services available through the use of the TCH Fleet Fuel Card platform ("TCH Services"), shall be made available to Applicant pursuant to the terms and conditions set forth herein. Applicant represents and warrants to TAB that all information provided by Applicant in the application previously submitted to TAB (the "Application"), is true and accurate in every respect. Applicant understands that TAB will rely on statements made in said Application as an inducement to TAB to issue a fuel line to Applicant and enter into this Agreement. Failure on Applicant's part to disclose complete and accurate information may result in rescission of the contract. APPLICANT UNDERSTANDS THAT ANY MATERIAL MISREPRESENTATION OR OMISSION WILL VOID THE CONTRACT.

Applicant hereby authorizes TAB to investigate and verify any and all information provided by Applicant, and Applicant hereby authorizes and directs each and every reference, bank, lending institution, credit company, or other person named by Applicant, (hereinafter referred to as "Reference") to provide to TAB any and all information requested by TAB relating to Applicant's business and credit relationship with the Reference. Applicant hereby agrees to hold harmless TAB and Reference from any claim or damage arising from TAB's use of any information obtained from the Application or from a Reference. IN THE EVENT THAT TAB ACCEPTS APPLICANT'S APPLICATION FOR ANY SERVICE OR CREDIT PROVIDED FOR HEREIN OR OTHERWISE EXTENDS TO APPLICANT ANY PRIVILEGE, CREDIT OR SERVICE REQUESTED HEREIN, APPLICANT SHALL AND DOES AGREE THAT IN CONSIDERATION OF THE MUTUAL COVENANTS AND CONDITIONS SET FORTH HEREIN AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, APPLICANT WILL COMPLY WITH ALL OF THE TERMS, CONDITIONS, AGREEMENTS AND PROVISIONS SET FORTH BELOW:

1. Fees and Payments: Subject to the terms and conditions provided herein and according to the credit terms approved by TAB, Applicant hereby agrees to remain responsible for paying all charges, including without limitation, the gross sales price of all goods and services purchased using TCH Services, data usage, telecommunications services, any and all taxes, surcharges, fees, assessments or customer service assistance fees, any and all minimum monthly transaction requirements as described in Exhibit A hereto and incorporated herein for all purposes, or any other charge reasonably determined by TAB to be imposed on Applicant. Applicant hereby acknowledges the receipt of Exhibit A hereto and agrees that charges and fees assessed to Applicant by TAB may be determined using said Exhibit. Time is of the essence for payment. Applicant further agrees that interest shall accrue on any delinquent credit balance from the date due at the highest rate permitted by law or 18 percent per annum, whichever amount shall be less.

2. Collection and Attorneys Fees: In the event TAB consults or engages an attorney or collection agency to collect any delinquent balance, as determined by TAB, Applicant agrees to pay all fees so expended, to the extent they are reasonable, together with all costs and expenses of collection and litigation. For purposes of this Agreement, "costs and expenses of collection and litigation" may include collection fees in the amount of one-third of the outstanding bill, which may be added by the collection agency at the time of referral of the account should TAB choose to refer the account to a collection agency.

3. Term and Termination: Subject to the terms and conditions set forth herein, this Agreement shall be effective when accepted by TAB and shall continue in full force and effect for the term set forth in Exhibit A hereto, (the "Initial Term") which term shall renew automatically for successive like periods unless earlier terminated in accordance with the provisions provided herein. Applicant may terminate this Agreement only after the Initial Term by notifying TAB of Applicant's intent to terminate this Agreement within sixty (60) days prior to the renewal date and TAB hereby reserves the right and privilege to terminate this Agreement, to revoke or suspend Applicant's charge privileges, to interrupt or terminate Applicant's TCH Services at any time without notice and/or to amend this Agreement at any time. All credit limits granted hereunder shall be established by TAB and at TAB's sole judgment and discretion may be raised or lowered at any time without notice to Applicant. Termination of this Agreement or revocation or suspension of Applicant's TCH Services shall not affect Applicant's obligation incurred hereby to pay for any minimum monthly transaction requirements or purchases made by Applicant, its agents or employees using TCH Services either before or after notice of termination, revocation or suspension.

4. Amendments: Amendments to this Agreement and/or Exhibit A shall be effective immediately upon notice of the proposed amendment as mailed to Applicant at the address provided in the Application.

5. Limitation of Liability: At no time shall TAB be liable to Applicant for any and all damages sustained by Applicant due to any AR Form 38: Rev 7/12/07

EXHIBIT B

delay or failure in processing a transaction or card management request, delay or failure resulting from transmission or equipment failure, revocation, suspension, interruption, or termination of Applicant's TCH Services. IN NO EVENT SHALL TAB BE RESPONSIBLE FOR CONSEQUENTIAL DAMAGES, REGARDLESS OF WHETHER OR NOT TAB WAS MADE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. TAB MAKES NO REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

6. Confidentiality: TAB and Applicant agree and covenant to each other that they shall not, during the performance of this Agreement or at any other time after the termination or expiration hereof, use or disclose to any third party other than during the proper performance of their duties hereunder, any of the procedures, practices, confidential dealings, or other confidential information concerning the business, finances, transactions, customer lists, or affairs of the other party hereto, including any written documentation thereof. Further, neither party shall disclose the terms of this Agreement to any other person or entity without the prior written consent of the other party hereto. This paragraph shall not apply to information that is (1) already in the public domain, (2) used to provide credit references, (3) known or obtained by the other party not claiming confidentiality from some source other than the party claiming confidentiality (4) used in any dispute resolution forum between the parties hereto, including any and all investigation or collection efforts, or (5) required to be disclosed by law or judicial mandate.

7. Authorized Use: Applicant shall not make or allow its agents or employees to make purchases using TCH Services in excess of the limitations established and maintained by TAB. Nothing contained in this paragraph or elsewhere in this Agreement shall be construed so as to relieve Applicant of any obligation to pay for goods, services or fees charged on Applicant's fuel line account.

8. Card Management: In the event that TAB approves Applicant's Application, Applicant accepts responsibility for the management of any and all of Applicant's TCH Services. Such management shall include without limitation, activating TCH Services, inactivating TCH Services, setting any and all card level credit limits (subject to credit approval) and monitoring the use of any and all TCH Services. Subject to the terms and conditions set forth in this Agreement, Applicant understands and agrees that it is Applicant's responsibility to verify that Applicant's efforts to manage TCH Services are properly communicated to TAB's service provider, TCH LLC, ("TCH"). Applicant agrees that any individual able to provide TCH with an Applicant's carrier id and password and/or any other password assigned to or used by Applicant, is authorized by Applicant to receive information about and make changes to Applicant's TCH Services. Applicant further agrees that in the event that TAB authorizes and pays an amount requested by an individual authorized to use Applicant's TCH Services that is different from the amount available on the particular TCH platform product, Applicant shall make payment for the amount authorized by TAB and nothing contained in this paragraph or elsewhere in this Agreement shall be construed so as to relieve Applicant of any obligation to pay for goods or services charged using Applicant's TCH Services.

9. Debit Charges: Pursuant to the terms of credit approved by TAB as described in Exhibit A, as amended from time to time, TAB, its agents, successors and/or assigns shall debit draft Applicant's TAB Alliance account or other Applicant account, if approved by TAB, at any time during the approved calendar interval for any and all outstanding charges. TAB, its agents, successors and/or assigns shall at any time have the option to choose the dates and times during the approved interval to debit draft Applicant's account. Failure of Applicant to maintain an amount sufficient to satisfy any such debit draft of Applicant's account shall constitute a material breach of this Agreement, and TAB may immediately terminate this Agreement and pursue any and all remedies available to it by law, equity, statute or otherwise.

10. Right to Payment: TAB's delay or failure to proceed with collection efforts shall not be construed as a waiver of TAB's right to do so, nor shall said failure or delay be a waiver of TAB's right to demand strict compliance with the terms of this Agreement with respect to payment of the delinquent account or amounts due on future extensions of credit.

11. Security: Applicant hereby understands and agrees that any and all security interests granted to TAB by that certain Accounts Receivable Purchase and Security Agreement entered into between the parties, attached hereto and incorporated herein by this reference for all purposes, (the "Purchase Agreement") shall also secure the payment and performance in full of all of the terms and conditions contained herein and TAB hereby reserves the right to at any time exercise any and all powers, rights and remedies granted to TAB under the Purchase Agreement.

12. Dispute Procedure: This Agreement and all transactions contemplated hereunder shall be governed by, construed under and enforced in accordance with the terms and conditions set forth in this Agreement and the Purchase Agreement. If Applicant disputes a statement amount, Applicant shall notify TAB through TCH of the dispute within 48 hours of receipt of the statement. Failure of Applicant to notify TAB through TCH within such 48-hour period shall constitute Applicant's conclusive acceptance of the amount of the statement. In the event Applicant gives TAB timely notice of a dispute with respect to a statement amount, TAB shall reduce the amount of the following debit draft by the disputed amount. If the parties mutually resolve the disputed amount within the ten (10) day
AR Form 38: Rev 7/12/07

period following Applicant's notice to TAB of the dispute, Applicant shall pay TAB the agreed amount, together with interest thereon as provided herein for delinquent sums, or TAB may add the agreed amount to the amount of the next scheduled statement following the resolution of the dispute.

12.1 If after ten (10) days the parties cannot resolve the dispute, the parties may request in writing that the matter be submitted to arbitration. Said arbitration shall take place in Salt Lake City, Utah, and be governed by the then-current rules of the American Arbitration Association. This Agreement shall be interpreted, construed and governed in accordance with the laws of the State of Utah, U.S.A., without reference to conflict of laws principles. All disputes arising from or relating to this Agreement shall be within the exclusive jurisdiction of the state and/or federal courts located within the State of Utah and the parties hereby consent to such exclusive jurisdiction and waive objections to venue therein; provided, however, that to the extent necessary in order to obtain an order or an injunction outside of the United States, the parties hereby consent to jurisdiction for such a proceeding of appropriate courts or other tribunals located outside of the United States. To the extent that a state and/or federal court located within the State of Utah refuses to exercise jurisdiction hereunder, the parties agree that jurisdiction shall be proper in any court in which jurisdiction may be obtained notwithstanding this paragraph.

12.2 Prior to arbitration, the parties shall stipulate on a specific list of issues to be submitted for the arbitrator's decision. The arbitrator's ruling shall be limited to the issues submitted. Should a further dispute arise regarding either interpretation or enforcement of the arbitrator's ruling, the parties' remedy shall be to re-submit the matter to the same arbitrator. Following arbitration, the prevailing party shall be entitled to recover costs of the arbitration. The arbitrator in his or her discretion may also award the prevailing party reasonable attorney's fees. Should either party be dissatisfied with the arbitrator's award, that party has the right to request judicial review of the award. Judicial review shall take place on a de novo basis without a jury. The prevailing party at the trial de novo will be entitled to recover costs and attorney's fees. In the event that the arbitrator orders the Applicant to pay money to TAB, the Applicant shall pay interest upon such sums at the interest rate provided in this Agreement from the date the money was due to TAB. Applicant shall pay sums not disputed in strict accordance with this Agreement.

13. Fraud Prosecution: Applicant and TAB agree to cooperate with each other in preventing and prosecuting any fraudulent activity by employees of any party hereto or any third-party with respect to services anticipated by this Agreement, the use of TCH Services or arising in connection with any other relationship between the parties anticipated by this Agreement. TAB reserves the right to interrupt, suspend or terminate TCH Services without notice to Applicant if TAB suspects fraudulent, illegal or abusive activity. Applicant agrees to provide, at no cost to TAB, any and all documentation and information as TAB may request, including but not limited to affidavits and police reports. Failure to provide reasonable cooperation will result in Applicant's liability for all fraudulent usage.

14. Entire Agreement: This Agreement, any and all attachments hereto and the Purchase Agreement represent a fully integrated expression of the parties' intentions and constitutes the entire understanding and agreement of the parties hereto with respect to the subject matter hereof. The parties hereto expressly acknowledge that there are no other promises or representations, either written or oral, that shall be binding on either party unless expressed herein or in another integrated contract between the parties.

15. Notices and Communications: Subject to the terms and conditions provided herein, notices and communications given pursuant to this Agreement shall be in writing and shall be deemed given when received by the parties as follows: (1) by facsimile to TAB at (801) 624-4675 or to Applicant at the number provided in the Application or such other number as each party may provide to the other, in which case, delivery will be deemed on the day transmitted; (2) by personal delivery to Applicant at the address designated in the Application or to TAB at 4185 Harrison Blvd., Suite 200, Ogden, UT 84403, in which case, delivery shall be deemed on the day delivered; (3) by sending the notice to Applicant at the address designated in the Application or to TAB at 4185 Harrison Blvd., Suite 200, Ogden, UT 84403, in which case, delivery shall be deemed on the fourth day following deposit in the mail; (4) by Federal Express, DHL, Airborne, Express mail, United Postal Service or other similar overnight carrier where next-day delivery is receipted to Applicant at the address designated in the Application or to TAB at 4185 Harrison Blvd., Suite 200, Ogden, UT 84403, in which case, delivery shall be deemed on the day following the date of delivery to the courier, unless the date of delivery falls on a legal holiday or Friday, at which delivery shall be deemed on the next business day. TAB and Applicant may change the address for delivery of notice by giving prior written notice to the other party as required herein.

16. Assignment: Applicant may not assign any right or interest herein to any other party without first obtaining the written consent of TAB, which consent may be withheld at TAB's sole discretion. TAB reserves all rights of assignability of this Agreement, whether through TAB's successors or assigns. TAB's successor or assignee shall retain all rights held by TAB at the time of assignment or transfer of interest, such rights including any which may have come into existence during the transfer of such interest or immediately thereafter.

AR Form 38: Rev 7/12/07

17. Waiver: No waiver of any breach of this Agreement shall be construed as a waiver of any subsequent or other breach of the same provision or any other provision of this Agreement.

18. Severability: In the event that any provision in this Agreement shall be construed by a court of competent jurisdiction to be unlawful or unenforceable and if the offending provision can be reformed to effect the clear intention of the parties as expressed herein, then, the offending provision shall be so reformed, and the remainder of this Agreement shall remain in full force and effect as written. If the offending provision cannot be reformed to effect the clear intention of the parties hereto, then, this Agreement shall be deemed to be reformed to exist as now written but without the offending provision.

19. Third-Party Representations: Nothing in this agreement encompasses any representations made between any party hereto and any third party to this agreement.

20. Signature Authority. The undersigns hereby certify that they have been duly authorized by all necessary and appropriate corporate action to execute this Agreement on behalf of their respective Party to form a legally binding contract and understand that acceptance of this Agreement constitutes an agreement to be bound to perform in strict conformity with the terms and conditions set forth herein.

21. Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver each manually executed counterpart shall not affect the validity, enforceability or binding effect of this Agreement

IN WITNESS WHEREOF, the Applicant has caused this Agreement to be duly executed and delivered by its respective officer thereunto duly authorized as of the date provided below

Ingram Brothers, LLC

By: Jay Ingram

Name: Jay-clayton

Title: Owner

Date: 9/18/08

Transportation Alliance Bank Inc.

By: [signature]

Name: Jeffrey H. Hagen

Title: Corp. Counsel

Date: 9/18/08

AR Form 38: Rev 7/12/07

EXHIBIT B

### Ingram Brothers, LLC
### TAB FUEL LINE
### EXHIBIT A

| | |
|---|---|
| CREDIT LIMIT: | $35,000.00 |
| EFT PAYMENTS SHALL BE MADE: | Daily |
| TRANSACTION FEE: | $1.25 |
| TERM: | 24 months |
| MINIMUM MONTHLY TRANSACTION FEE: | $607.00 |
| MONEY CODE TRANSACTION FEE: | $2.00 |

Initials: JRI

Title: Owner

AR Form 38: Rev 7/12/07